UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CAROLE GRANT-HALL, PAUL J. ASIAMA, CORNELIUS GRAY, and JENA PERRY, on behalf of themselves and those similarly situated, | ) ) ) | |
| | ) | 11 C 1832 |
| Plaintiffs, | ) | |
| | ) | Judge Feinerman |
| vs. | ) | |
| | ) | |
| CAVALRY PORTFOLIO SERVICES, LLC, ARTHUR B. ADLER & ASSOCIATES, LTD. d/b/a ADLER & ASSOCIATES, LTD., LAW OFFICE OF KEITH S. SHINDLER, LTD. d/b/a THE SHINDLER LAW FIRM, and KEVIN M. KELLY, P.C., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Section 8b of the Illinois Collection Agency Act ("ICAA"), 225 ILCS 425/8b, provides

that a debt collection agency may file suit in its own name against a debtor only if it has been

assigned the debtor's account, and only if the assignment has been documented in a written

agreement that states the effective date of and consideration paid for the assignment and that

identifies the assigned account.  Plaintiffs Carole Grant-Hall, Paul J. Asiama, Cornelius Gray,

and Jena Perry, on behalf of themselves and a putative class, brought this lawsuit against

Defendant Calvary Portfolio Services, LLC, a debt collection agency that brought collection

actions against them in Illinois state court, and Defendants Arthur B. Adler & Associates, Ltd.,

Law Office of Keith S. Shindler, Ltd., and Kevin M. Kelly, P.C. (together, "Law Firms"), the

lawyers who represented Calvary in those actions.  The gist of this lawsuit is that Defendants

filed the state court actions even though Calvary did not have the documentation required by

§ 8b. Plaintiffs' amended complaint purports to state claims against Calvary under the ICAA,

225 ILCS 425/1 *et seq*., and the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/1 *et seq*.,

and against all Defendants under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.

§ 1692 *et seq*.  Cavalry and the Law Firms have separately moved to dismiss the amended

complaint under Federal Rule of Procedure 12(b)(6).  Their motions are denied.

## Background

The well-pleaded facts alleged in Plaintiffs' amended complaint are assumed true on a

Rule 12(b)(6) motion.  *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir.

2010).  Also pertinent at the Rule 12(b)(6) stage are exhibits attached to the amended complaint.

*See* Fed. R. Civ. P. 10(c); *Witzke v. Femal*, 376 F.3d 744, 749 (7th Cir. 2004).  Among those

exhibits are the state court complaints from Calvary's collection actions against Plaintiffs.  Doc.

30-3 at 4-11 (Grant-Hall), 13-25 (Asiama); at 35-36 (Gray); 38-39 (Perry).  Orders entered and

filings made in this and other courts are subject to judicial notice on a Rule 12(b)(6) motion.  *See*

*Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 676 n.2 (7th Cir. 2009);

*United States v. Stevens*, 500 F.3d 625, 628 n.4 (7th Cir. 2007).  To the extent an exhibit or a

judicially noticed court document contradicts the amended complaint's allegations, the exhibit or

court document takes precedence.  *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542

(7th Cir. 2007).

Cavalry is a debt collection agency licensed in Illinois.  Kelly, Adler, and Shindler are law

firms that represent Cavalry in debt collection actions.  In September 2010, Kelly sent Grant-Hall

a letter saying that unless she paid her debt to Cavalry, Kelly would "be entitled to file a lawsuit

against you for the collection of this debt when the week is over."  Doc. 30 at ¶ 28; Doc. 30-3 at

2.  In November 2010, Kelly filed collection actions on Calvary's behalf in the Circuit Court of Cook County against Grant-Hall and Asiama.  Doc. 30 at ¶¶ 32-33; Doc. 30-3 at 4-11, 13-25.  In July 2010, Shindler filed a collection action on Calvary's behalf in the Cook County court against Perry, and in January 2011, Adler filed a collection action on Calvary's behalf in the Circuit Court of Will County against Gray.  Doc. 30 at ¶¶ 34-35; Doc. 30-3 at 35-36, 38-39.

The complaints in the Grant-Hall and Asiama state court cases are nearly identical.  They allege that Grant-Hall and Asiama opened accounts with Orchard Bank and Wells Fargo Bank, N.A., respectively; that Calvary "is the successor in interest of said charge account[s] … having purchased said account[s] in good faith, for value and in the regular course of business"; and that the accounts were in default.  Doc. 30 at ¶ 36; Doc. 30-3 at 4, 13.  Attached to each complaint is an "Affidavit of Claim" executed by a Calvary employee, a "Bill of Sale," an "Assignment," and an account statement.  The Affidavits of Claim state that Grant-Hall and Asiama opened accounts with "HSBC Bank Nevada, N.A. \ Orchard Bank" and Wells Fargo Bank, N.A., respectively; that Calvary SPV I, LLC purchased the accounts; that "the servicing and collection rights for the account[s] were assigned by Cavalry SPV I, LLC to [Cavalry]"; that the accounts are in default; and that a certain amount is due.  Doc. 30 at ¶ 39; Doc. 30-3 at 5, 14.

The Bills of Sale attached to the Grant-Hall and Asiama complaints document the sale of the accounts from the original creditors to Cavalry SPV I.  The Bill of Sale attached to the Grant-Hall complaint states:

> HSBC CARD SERVICES (III) INC., HSBC BANK NEVADA, N.A. ("Seller"), for value received and pursuant to the terms and conditions of the Purchase Agreement ("Agreement") dated July 10, 2009 between Seller and Cavalry, SPV I, LLC, ("Purchaser"), does hereby sell, assign and convey to

> Purchaser, its successor and assigns, all right, title and interest of Seller in and to those certain purchased receivables listed on the Sale File.

Doc. 30-3 at 8. The Bill of Sale attached to the Asiama complaint states:

> This purchase and sale is made pursuant to the terms of the [January 14, 2010 Purchase Agreement], which terms are incorporated herein by reference … . [Wells Fargo Bank, N.A.] hereby absolutely sells, transfers, assigns, sets over and conveys to Cavalry SPV I, LLC all of Seller's right, title, and interest in and to each of the Receivables identified in Schedule I.

*Id*. at 19. This Bill of Sale appears to identify the purchase price for the accounts, but the price is redacted in the copy attached to Calvary's state court complaint. *Ibid*.

The Assignments attached to the Grant-Hall and Asiama complaints document, at least in part, the assignment of the accounts from Cavalry SPV I to Cavalry. The Assignment attached to the Grant-Hall complaint states:

> The undersigned Cavalry SPV I, LLC ("Assignor"), effective as of January 27, 2010 hereby transfers and assigns to [Cavalry] ("Assignee"), all of Assignor's rights to pursue collection and judicial enforcement of obligations under each of the Assignor's accounts purchased pursuant to that Purchase Agreement dated July 10, 2009, by and between Assignor and HSBC Bank Nevada, N.A. and HSBC Card Services (III), Inc., … including engagement of attorneys and commencement of legal actions reasonably required to enforce said obligations, for the consideration of the Assignor's covenants in the Servicing and Management Agreement between Assignor and Assignee dated as of June 13, 2003.

Doc. 30 at ¶ 40; Doc. 30-3 at 7. The Assignment attached to the Asiama complaint is materially identical, with the only differences being the effective date (February 22, 2010) and the referenced Purchase Agreement (January 14, 2010 Purchase Agreement). Doc. 30 at ¶ 41; Doc. 30-3 at 18. None of the documents referenced in the Bills of Sale and the Assignments—the Purchase Agreements, the Sale File, Schedule I, and the Servicing and Management Agreement—are attached to Calvary's state court complaints.

The Perry complaint alleges that Perry "opened an ... account with Washington Mutual Bank"; that Calvary "is the assignee and bona fide owner of Defendant's … account"; and that the account is in default. Doc. 30 at ¶ 38; Doc. 30-3 at 38. The Gray complaint alleges that Gray had been issued "a certain credit card/revolving charge (open end consumer credit) account" and that the account was in default. Doc. 30 at ¶ 37; Doc. 30-3 at 35. The only document attached to the Perry complaint and Gray complaint is an Affidavit of Claim materially identical to the those attached to the Grant-Hall and Asiama complaints. Doc. 30 at ¶ 39; Doc. 30-3 at 36, 39. Even though the Perry and Gray complaints do not attach the other sale and assignment documents, the amended complaint alleges that those documents exist and are effectively identical to the Bills of Sale and Assignments attached to the Grant-Hall and Asiama complaints. Doc. 30 at ¶ 42.

On January 18, 2011, Grant-Hall moved the state court to vacate a default judgment that had been entered against her; she also asserted as an affirmative defense that Calvary had not complied with § 8b of the ICAA. Doc. 30 at ¶ 50; Doc. 30-3 at 27-31. Before the motion could be heard, Calvary voluntarily dismissed the action. Doc. 30 at ¶ 51; Doc. 30-3 at 33. Calvary also voluntarily dismissed the Asiama, Perry, and Gray actions. Doc. 30 at ¶¶ 52-53; Doc. 51-1.

Grant-Hall and Asiama filed this lawsuit against Calvary and Kelly in the Circuit Court of Cook County in February 2011. Doc. 5 at 1-14. Calvary timely removed the suit to this court. Doc. 1. Plaintiffs then filed an amended complaint adding Gray and Perry as plaintiffs and Adler and Shindler as defendants. Doc. 30. The amended complaint alleges that "[n]one of the lawsuits filed or threatened against Illinois residents by defendants was based on an assignment that complied with ICAA § 8b" because "[n]othing in any 'assignment' purports to transfer title to any alleged debt to Cavalry[;] … specifies, by name, account number, or other unique

identifiers, the particular debts that are supposedly transferred[; or] … purports to state the consideration for the transfer." *Id*. at ¶¶ 43-49, 59-60. Plaintiffs charge that the practice of filing or threatening to file suits prohibited by § 8b violates the ICAA, the ICFA, and the FDCPA.

## Discussion

### I.     Standing

The amended complaint alleges that "Plaintiffs were required to expend time and money retaining counsel and defending the collection lawsuits." Doc. 30 at ¶ 55. This is sufficient to establish the concrete injury (time and money), causation (collection actions), and redressability (compensatory damages) necessary to establish Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 750 (7th Cir. 2011). Calvary argues that Plaintiffs lack standing because the state court collection actions have been dismissed. Doc. 51 at 18. The argument is meritless, as the time and money Plaintiffs spent contesting the state court actions already had been incurred by the time those actions were dismissed.

Cavalry also contends that Plaintiffs lack "standing to affirmatively challenge the assignments" between it and Cavalry SPV I. Doc. 71 at 8-9. The contention is meritless, at least as a ground to contest Plaintiffs' Article III standing to pursue the claims set forth in the amended complaint. Each plaintiff challenges not the assignments of the accounts themselves, but rather Defendants' filing of debt collection actions against them without having first documented the assignments in a written agreement that states the effective date of and consideration paid for the assignment and that identifies the account being assigned. Plaintiffs surely have Article III

standing to challenge the legality of debt collection actions brought against them personally.  *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105-06 (D.C. Cir. 2008).

## II.    ICAA Claim

According to the Appellate Court of Illinois, § 8b of the ICAA addresses the "real danger" that "debtors might be sued by a party who does not have a legal interest in their debt" by "demanding strict proof of an account's chain of title before an action may commence to collect on that account."  *Unifund CCR Partners v. Shah*, 946 N.E.2d 885, 893 (Ill. App. 2011). Section 8b states that "[n]o litigation shall commence in the name of the licensee as plaintiff unless ... there is an assignment of the account that satisfies the requirements of this Section." 225 ILCS 425/8b(e).  "The assignment [must be] manifested by a written agreement ... [which] shall specifically state and include: (i) the effective date of the assignment; and (ii) the consideration for the assignment."  225 ILCS 425/8b(a); *see Mutual Mgmt. Servs., Inc. v. Swalve*, 956 N.E.2d 594, 598-99 (Ill. App. 2011); *Shah*, 946 N.E.2d at 892; *Bus. Serv. Bureau, Inc. v. Webster*, 698 N.E.2d 702, 704 (Ill. App. 1998); *Day v. Check Brokerage Corp.*, 511 F. Supp. 2d 950, 956-57 (N.D. Ill. 2007).  "Implicit in the statute is a third requirement that the contract of assignment specifically state the relevant identifying information for the account that is being assigned."  *Shah*, 946 N.E.2d at 892.

Calvary seeks dismissal of the ICAA claim on the ground that it possessed the required written documentation prior to bringing the state court collection actions.  Calvary may be right that it had that documentation at those times.  But the court cannot reach that conclusion on a Rule 12(b)(6) motion because the documentation is not attached to Plaintiffs' amended complaint or (assuming Rule 10(c) would permit its consideration) to Calvary's motion to

dismiss. The Bills of Sale and Assignments attached to the Grant-Hall and Asiama complaints do not state with specificity the consideration paid or the accounts being assigned. Doc. 30-3 at 7-8, 18-19. It follows that those documents, standing alone, do not satisfy § 8b. *See Shah*, 946 N.E.2d at 893-94; *Webster*, 698 N.E.2d at 704; *Day*, 511 F. Supp. 2d at 956-57. The Bills of Sale and Assignments do reference other documents—the July 10, 2009 and January 14, 2010 Purchase Agreements, the Sale File, Schedule I, and the Servicing and Management Agreement—that *might* satisfy § 8b. *See Shah*, 946 N.E.2d at 891-92 (holding that § 8b may be satisfied by multiple documents where one document incorporates others by reference). But those other documents are not attached to the Grant-Hall and Asiama complaints, and thus are not attached to Plaintiffs' amended complaint. All four state court complaints attach an Affidavit of Claim, but § 8b does not permit assignments to be documented by affidavit. *See id*. at 893.

Calvary advances four alternative grounds for dismissing the ICAA claim.[*] Each fails to persuade.

---

[*] Defendants read the amended complaint as alleging that they violated § 8b by failing to attach all the required documentation to the state court complaints. Doc. 51 at 5-7, 18-20; Doc. 56 at 7-11. Plaintiffs disclaim that theory, Doc. 66 at 10, 24-25, and wisely so; § 8b does not govern the documents that must be attached to an initial pleading, but merely requires that certain documentation *exist* before a debt collection agency files a collection action. Calvary also reads the amended complaint as alleging that § 8b was violated because Calvary purchased Plaintiffs' accounts for collection purposes only, with the assignor retaining the right to the lawsuit's proceeds. Doc. 30 at ¶¶ 56-60. The amended complaint does not appear to pursue that theory. The theory is not viable in any event. *See Shah*, 946 N.E.2d at 889-890 (holding that § 8b does not prohibit an assignee for collection purposes only from bringing a debt collection suit in its own name); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 279-85 (2008) (noting the majority rule that "an assignee of a legal claim for money [may] sue when that assignee had promised to give all litigation proceeds back to the assignor").

### A.    Commerce Clause

Calvary contends that § 8b's documentation requirement violates the dormant Commerce Clause.  The governing analysis is as follows:

> The Commerce Clause empowers Congress "[t]o regulate Commerce ... among the several States," Art. I, § 8, cl. 3, and although its terms do not expressly restrain "the several States" in any way, we have sensed a negative implication in the provision since the early days.  The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. ...  The law has had to respect a cross-purpose as well, for the Framers' distrust of economic Balkanization was limited by their federalism favoring a degree of local autonomy.
>
> Under the resulting protocol for dormant Commerce Clause analysis, we ask whether a challenged law discriminates against interstate commerce.  A discriminatory law is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.  Absent discrimination for the forbidden purpose, however, the law "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  State laws frequently survive this *Pike* scrutiny ... .

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-39 (2008) (most internal citations omitted, some internal quotation marks omitted, brackets and first ellipses in original).

The analysis is two-tiered.  The first tier imposes a "virtual *per se*" rule under which a statute is "generally struck down … without further inquiry."  *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)) ("*Alliant I*").  "This rule is applied when a statute 'directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests.'"  *Ibid.* (quoting *Brown-Forman*, 476 U.S. at 579).

The second tier, known as the "*Pike* balancing test," applies where the challenged statute "has only indirect or incidental effects on interstate commerce and regulates evenhandedly." *Ibid*. (internal quotation marks omitted). Challengers invoking the *Pike* test have a "steep hill to climb," with the statute surviving "unless the burden imposed on [interstate] commerce is *clearly* excessive in relation to the putative local benefits." *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 665 (7th Cir. 2010); *see also Baude v. Heath*, 538 F.3d 608, 611 (7th Cir. 2008) ("State laws regularly pass [the *Pike*] test for the Justices are wary of reviewing the wisdom of legislation (after the fashion of *Lochner*) under the aegis of the commerce clause."); *Nat'l Paint & Coatings Ass'n v. City of Chi.*, 45 F.3d 1124, 1130-31 (7th Cir. 1995) (describing the *Pike* test as a "normal rational-basis standard"). "[T]here is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the *Pike* … balancing approach. … In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Alliant I*, 330 F.3d at 911-12 (quoting *Brown-Forman*, 476 U.S. at 579).

Section 8b's documentation requirement survives both tiers of dormant Commerce Clause analysis. Regarding the first tier, the documentation requirement does not directly regulate or discriminate against interstate commerce; to the contrary, it applies with equal force to in-state and out-of-state debt collectors. *See Lebamoff Enters. v. Huskey*, 666 F.3d 455, 460 (7th Cir. 2012); *Baude*, 538 F.3d at 611; *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007); *Alliant I*, 330 F.3d at 916. Nor does the requirement "ha[ve] the 'practical effect' of regulating commerce occurring wholly outside that State's borders." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332, 336 (1989). The application of § 8b challenged by Plaintiffs mandates only

that a debt collection agency have certain documentation before bringing a collection action *in Illinois*. This regulates *intrastate* activity—the filing of suit in Illinois—and thus does not have the practical effect of regulating commerce occurring wholly outside Illinois. *See Midwest Title Loans*, 593 F.3d at 668 ("imposing a state's law on transactions in another state has a greater extraterritorial effect (and greater effect on commerce) than the state's applying its own law to suits in its courts"); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 662 (7th Cir. 1995) (noting that the Commerce Clause does not prohibit a State from requiring pre-sorting of all waste entering its borders). At most, § 8b has the indirect extraterritorial effect of requiring debt collection agencies to have certain documentation if they wish to file suit in Illinois. *See* 225 ILCS 425/8b(e). These indirect effects are appropriately considered under the *Pike* balancing test. *See Alliant Energy Corp. v. Bie*, 336 F.3d 545, 547-49 (7th Cir. 2003) (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 93 (1987)) ("*Alliant II*").

Section 8b survives the *Pike* test as well. In *Aldens, Inc. v. LaFollette*, 552 F.2d 745 (7th Cir. 1977), the Seventh Circuit considered a Wisconsin statute establishing maximum finance charges for consumer credit agreements with Wisconsin citizens. *Id.* at 747. The plaintiff, Aldens, was an Illinois company that sold general retail merchandise via mail order to Wisconsin customers. *Ibid.* The statute caused Aldens to prepare Wisconsin-specific catalogs containing Wisconsin-specific credit terms for its Wisconsin customers. *Id.* at 748. The Seventh Circuit upheld the statute under the *Pike* test, adopting in full the Third Circuit's opinion in *Aldens, Inc. v. Packel*, 524 F.2d 38 (3d Cir. 1975). *LaFollette*, 552 F.2d at 749. *Packel* featured the same plaintiff (Aldens) and a materially identical state statute. 524 F.2d at 41-42. The Third Circuit held that the statute survived *Pike* given "the historical recognition that the states may, despite

the burden on commerce, enact varying usury laws and varying contract laws," and because Congress had approved of the States' continuing role in regulating consumer credit transactions, *see* 15 U.S.C. § 1610(b). 524 F.2d at 48-49. The Eighth and Tenth Circuits in *Aldens, Inc. v. Miller*, 610 F.2d 538, 539-40 (8th Cir. 1979), and *Aldens, Inc. v. Ryan*, 571 F.2d 1159, 1162 (10th Cir. 1978), upheld substantially similar laws under *Pike*. *See also Silver v. Woolf*, 694 F.2d 8 (2d Cir. 1982) (in rejecting a Commerce Clause challenge to state licensing requirements for debt collectors, citing the State's legitimate interest in regulating debt collection and Congress's specific authorization of state regulation in that area).

The ICAA is no more burdensome on commerce, and no less tied to the States' traditional role in regulating consumer credit transactions, than the statutes upheld in *LaFollette*, *Packel*, *Miller*, and *Ryan*. The ICAA was enacted to serve Illinois's legitimate interest in "protect[ing] consumers against debt collection abuse." 225 ILCS 425/1a; *see Silver*, 694 F.2d at 12 ("Debt collection practices have long been viewed as a proper matter for regulation by the states."). As noted above, § 8b's documentation requirement addresses the "real danger" that "debtors might be sued by a party who does not have a legal interest in their debt." *Shah*, 946 N.E.2d at 893. And Congress has expressly authorized the States' continued regulation of debt collection agencies. *See Silver*, 694 F.2d at 13 (citing 15 U.S.C. § 1692n ("[The FDCPA] does not annul, alter, or affect, or exempt any person … from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of [the FDCPA], and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with [the FDCPA] if the protection such law affords any consumer is greater than the protection provided by [the FDCPA].")).

-12-

As for the burdens imposed by § 8b, the provision requires only that debt collectors have certain assignment documentation before filing suit, a burden comparable to those imposed by the statutes upheld in *LaFollette*, *Packel*, *Miller*, and *Ryan*. *See LaFollette*, 552 F.2d at 748; *Packel*, 524 F.2d at 41, 48 & n.15; *Miller*, 610 F.2d at 539; *Ryan*, 571 F.2d at 1162. This burden will not "adversely affect interstate commerce by subjecting activities to inconsistent regulations." *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 379 (7th Cir. 1998) (quoting *CTS*, 481 U.S. at 88); *see Midwest Title Loans*, 593 F.3d at 667. A collection agency may comply with the documentation requirements of the several States by generating multiple sets of documentation, each satisfying a particular State's standards.

For these reasons, § 8b does not violate the dormant Commerce Clause.

## B. Private Right of Action

Cavalry argues that there is no private right of action to enforce § 8b of the ICAA. It does not appear that any Illinois reviewing court has addressed that particular issue. In *Sherman v. Field Clinic*, 392 N.E.2d 154 (Ill. App. 1979), however, the Appellate Court of Illinois recognized an implied private right of action under § 9 of the ICAA, 225 ILCS 425/9. *Sherman*, 392 N.E.2d at 160-61; *see also Kim v. Riscuity, Inc.*, 2006 WL 2192121, at *3 (N.D. Ill. July 31, 2006); *Trull v. GC Servs. L.P.*, 961 F. Supp. 1199, 1206-07 (N.D. Ill. 1997); *but see McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 751 & n.16 (N.D. Ill. 2003). Because the Supreme Court of Illinois has not directly addressed whether a private right of action lies under § 9 or any other provision of the ICAA, this court may deviate from *Sherman* only if "there are persuasive indications that the [state supreme court] would decide the [issue] differently." *Commonwealth Ins. Co. v. Stone Container Corp.*, 323 F.3d 507, 509 (7th Cir. 2003) (quoting *Allstate Ins. Co. v.*

-13-

*Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002)).  There are no such persuasive indications; to

the contrary, the state supreme court has favorably cited *Sherman*'s private right of action

analysis.  *See Sawyer Realty Group, Inc. v. Jarvis Corp.*, 432 N.E.2d 849, 852-53 (Ill. 1982).

This case involves an alleged violation of § 8b, so why does it matter whether there is an

implied private right of action under § 9?  The reason is that § 9 incorporates § 8b by reference.

Section 9 sets forth a list of prohibited acts, including "[v]iolations of [the ICAA] or of the rules

promulgated [under the ICAA]," 225 ILCS 425/9(a)(1), "[a]ttempting or threatening to enforce a

right or remedy with knowledge or reason to know that the right or remedy does not exist," 225

ILCS 425/9(a)(20), and "[e]ngaging in dishonorable, unethical, or unprofessional conduct of a

character likely to deceive, defraud, or harm the public," 225 ILCS 425/9(a)(31).  Those

prohibited acts—or, at the very least, the first two prohibited acts—encompass filing a debt

collection suit without the documentation required by § 8b.  It follows that Plaintiffs have a

private right of action under § 9 to seek a remedy for Calvary's alleged violation of § 8b.

### C.    Actual Damages

Cavalry contends that the ICAA claim should be dismissed because the amended

complaint does not plead actual damages.  Although Illinois reviewing courts apparently have not

yet addressed the issue, judges in this District have held that a plaintiff must plead "actual

damages" to proceed with an ICAA claim.  *See Herkert v. MRC Receivables Corp.*, 655 F. Supp.

2d 870, 881 (N.D. Ill. 2009); *Randolph v. Crown Asset Mgmt., LLC*, 254 F.R.D. 513, 519 (N.D.

Ill. 2008); *McCabe*, 272 F. Supp. 2d at 752; *Trull*, 961 F. Supp. at 1207-08.  Some of those

decisions hold that attorney fees incurred in defending collection actions do not qualify as "actual

damages" under the ICAA.  *See Herkert*, 655 F. Supp. 2d at 881; *McCabe*, 272 F. Supp. 2d at

752.  There is no need here to explore whether those holdings are distinguishable or incorrect.

The amended complaint alleges that Plaintiffs suffered damages incurred in "defending the

collection lawsuits."  Doc. 30 at ¶ 55.  Those damages include the appearance fees Plaintiffs were

required to pay in state court.  *See* 705 ILCS 105/27.2(e); 705 ILCS 105/27.2a(e).  And there is

no dispute in the decided cases that appearance fees qualify as "actual damages" under the ICAA.

*See Herkert*, 655 F. Supp. 2d at 881; *Blum v. Lawent*, 2004 WL 2191612, at *5 (N.D. Ill. Sept.

27, 2004) (awarding the amount paid as an appearance fee as actual damages).  The amended

complaint therefore pleads actual damages for purposes of Plaintiffs' ICAA claim.

### D.      Calvary's Liability for the Law Firms' Conduct

Finally, Cavalry maintains that the ICAA does not permit Plaintiffs to hold it vicariously

liable for the Law Firms' filing of lawsuits in alleged violation of § 8b.  As a general rule, a client

is not responsible for its attorney's misconduct because "an attorney usually pursues a client's

legal rights without specific direction from the client, using independent professional judgment

to determine the manner and form of the work."  *Horwitz v. Holabird & Root*, 816 N.E.2d 272,

278-79 (Ill. 2004).  The general rule is subject to exceptions:

> [W]here a plaintiff seeks to hold a client vicariously liable for the attorney's
> allegedly intentional tortious conduct, a plaintiff must prove facts
> demonstrating either that the client specifically directed, controlled, or
> authorized the attorney's precise method of performing the work or that the
> client subsequently ratified acts performed in the exercise of the attorney's
> independent judgment.  If there is no evidence that the client directed,
> controlled, authorized, or ratified the attorney's allegedly tortious conduct,
> no vicarious liability can attach.

*Id*. at 279; *see also Schutz v. Arrow Fin. Servs., LLC*, 465 F. Supp. 2d 872, 875-76 (N.D. Ill.

2006) ("Many courts have recognized that a company may be held vicariously liable [under the

FDCPA] for the collection activities of attorneys working on its behalf."). A client therefore may be held liable for an attorney's misconduct where the attorney acted "with the full knowledge and direction of the client." *Horwitz*, 816 N.E.2d at 277 (citing *Flight Kitchen, Inc. v. Chi. Seven-Up Bottling Co.*, 317 N.E.2d 663, 667 (Ill. App. 1974)). A client also may be liable if it ratifies the attorney's unauthorized act, as "ratification of an unauthorized act is tantamount to an original authorization and confirms what was originally unauthorized." *Id.* at 280. "A client ratifies the actions of his attorney by not repudiating the acts once he has knowledge of them, or by accepting the benefits of those acts. Ratification need not be express; it may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction." *Kulchawik v. Durabla Mfg. Co.*, 864 N.E.2d 744, 750 (Ill. App. 2007) (internal citations and quotation marks omitted).

The amended complaint's allegations are sufficient at the pleading stage to place Calvary within the exceptions to the general rule. Calvary has filed thousands of debt collection suits in Illinois, primarily through the Law Firms. Doc. 30 at ¶¶ 12-13, 18-19; Docs. 30-1, 30-2. It is fair to infer that Calvary, as a veteran debt collector and volume purchaser of legal services, has much greater control over its attorneys than does the typical client, that Calvary understands the restrictions imposed by § 8b of the ICAA, and that Calvary was aware of and ratified the practice of filing debt collection actions with whatever assignment documents were in hand. Dismissal on the pleadings therefore is inappropriate. *See Fleming-Dudley v. Legal Investigations, Inc.*, 2007 WL 952026, at *14-15 (N.D. Ill. Mar. 22, 2007) (holding that whether a debt collector exercised sufficient control over a "repossession man" to be held vicariously liable under the FDCPA was a factual issue that could not be resolved on a Rule 12(b)(6) motion).

### III.     ICFA Claim against Cavalry

The ICFA is a "regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)).  The statute provides redress for deceptive business practices and also for business practices that, while not deceptive, are unfair.  *See ibid*.  To state an ICFA claim, Plaintiffs must allege "(1) a deceptive [or unfair] act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the [act or practice]; (3) the [act or practice] occurred in the course of conduct involving trade or commerce; (4) the plaintiff suffered actual damage; and (5) the damage was proximately caused by the [act or practice]." *Geschke v. Air Force Ass'n*, 425 F.3d 337, 345 (7th Cir. 2005) (citing *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002)); *see also Siegel*, 612 F.3d at 934 (citing *Robinson*, 775 N.E.2d at 960).

The amended complaint adequately pleads a deceptive practices claim.  It alleges that Cavalry "[m]isrepresent[ed] to consumers and courts that it had the right to file suit," Doc. 30 at ¶ 77; that Cavalry intended Plaintiffs to rely on that deceptive practice, *id*. at ¶ 79; that the deceptive act occurred in the course of trade and commerce, *id*. at ¶ 78, *see Illinois ex rel. Daley v. Datacom Sys. Corp.*, 585 N.E.2d 51, 64 (Ill. 1991); and that the deceptive act proximately caused actual damages in the "time and money" Plaintiffs spent defending the debt collection lawsuits, Doc. 30 at ¶ 55.  Because a deceptive practices claim has been alleged, there is no need at this point to address whether the amended complaint also pleads a viable unfair practices claim under the ICFA.

-17-

Calvary maintains that it cannot be held vicariously or derivatively liable under the ICFA for the Law Firms' alleged misconduct. "Substantial authority in this judicial district has held that derivative liability is not allowed under the [ICFA]." *Fleming-Dudley*, 2007 WL 952026, at *16 (citing cases); *see Suarez v. JPMorgan Chase Bank NA*, 2011 WL 2149427, at *6-7 (N.D. Ill. June 1, 2011); *Costa v. Mauro Chevrolet, Inc.*, 390 F. Supp. 2d 720, 733 (N.D. Ill. 2005). "The Illinois Supreme Court has emphasized … that liability under the [ICFA] is limited to defendants who have actually participated in the scheme to defraud the plaintiff." *Id*. at 733-34.

For example, in *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853 (Ill. 1998), Direct American duped consumers into calling 900 numbers by sending them mailings stating that they had won a prize and could claim it by calling a 900 number, which turned out to be quite expensive. *Id*. at 856. AT&T billed callers for the calls and retained a percentage for itself. *Ibid*. The state supreme court held that while AT&T could not be held liable under the ICFA for merely "knowingly receiv[ing] the benefits of another's fraud," it could be liable for "directly violat[ing] the Act by reviewing, revising, and approving Direct American's deceptive solicitations and recorded messages." *Id*. at 859-61. In *Jackson v. S. Holland Dodge, Inc.*, 755 N.E.2d 462 (Ill. 2001), the debtor on a retail assignment contract sued the contract's assignor and assignee under the ICFA for misleading disclosures that violated the Truth in Lending Act ("TILA"). *Id*. at 465. The state supreme court held that the assignee could not be held derivatively liable for the assignor's violations of TILA. *Id*. at 468-70. The court noted, however, that the assignee could be liable under the ICFA for "active and direct" fraud—if, for example, the assignee had concocted a scheme with the assignor to make the misleading disclosures. *Id*. at 470-71.

-18-

*Jackson* and *Zekman* appear to foreclose derivative and vicarious liability under the ICFA where there is an arms-length, non-agency contractual relationship between the defendant and the primary wrongdoer. *Jackson* addresses whether the assignee of a debt contract could be held liable for the assignor's misconduct towards the debtor. 755 N.E.2d at 448-71; *see also Costa*, 390 F. Supp. 2d at 733-37 (same). *Zekman* addresses whether a defendant that knowingly benefitted from the wrongdoer's fraud could be held liable for the wrongdoer's alleged misconduct where there was no agency relationship. 695 N.E.2d at 859-60; *see also Fleming-Dudley*, 2007 WL 952026, at *16. *Jackson* and *Zekman* do not address traditional principal-agent relationships, and thus do not purport to foreclose traditional agency liability. Nor do they purport to undermine the principle, exemplified by the Illinois Supreme Court's subsequent decision in *Horwitz v. Holabird & Root*, *supra*, that a client under some circumstances may be held liable for an attorney's alleged misconduct.

It would be wrong to read *Jackson* and *Zekman* beyond their scope to foreclose or undermine those settled liability principles. The ICFA itself expressly recognizes that a defendant may be held liable for the actions of its attorney or agent. *See* 815 ILCS 505/1(c) ("The term 'person' includes any natural person or his legal representative, partnership, corporation (domestic and foreign), … and any agent … ."); 815 ILCS 505/3 (recognizing that a "person" can be held liable under the ICFA); 815 ILCS 505/7 (same); 815 ILCS 505/10a(a) (same). Consistent with the statutory text, courts have long recognized that traditional agency liability principles apply in ICFA suits. *See Golden v. Barenborg*, 53 F.3d 866, 871 (7th Cir. 1995); *Salisbury v. Chapman Realty*, 465 N.E.2d 127, 133 (Ill. App. 1984); *Glen Ellyn Pharmacy v. Promius Pharm, LLC*, 2009 WL 2973046, at *5-7 (N.D. Ill. Sept. 11, 2009);

*Williams Elecs. Games, Inc. v. Barry*, 42 F. Supp. 2d 785, 796-97 (N.D. Ill. 1999). Accordingly, for the reasons discussed in conjunction with the ICAA claim, and assuming the truth of the amended complaint's allegations, Calvary may be held liable under the ICFA for the Law Firms' alleged misconduct. *See Horwitz*, 816 N.E.2d at 279-80. Moreover, based on the same factual predicate, Calvary made be held liable under the ICFA as an "active and direct" participant in the filing of the allegedly improper state court collection actions. *See Zekman*, 695 N.E.2d at 860-61; *Ware v. Indymac Bank, FSB*, 534 F. Supp. 2d 835, 841-42 (N.D. Ill. 2008); *Vance v. Nat'l Benefit Ass'n*, 1999 WL 731764, at *5 (N.D. Ill. Aug. 30, 1999).

Cavalry also asserts that it cannot be held liable under the ICFA for the Law Firms' actions because the ICFA does not apply to attorneys. Cavalry's premise—that Plaintiffs may not sue the Law Firms under the ICFA—is correct. In *Cripe v. Leiter*, 703 N.E.2d 100 (Ill. 1998), the Supreme Court of Illinois held that because "the attorney-client relationship … is already subject to extensive regulation by [the state supreme court]," the ICFA does not "apply to the conduct of attorneys in relation to their clients." *Id*. at 106. That principle has been extended beyond suits by clients against their lawyers to claims against someone else's attorney. *See Wilbourn v. Advantage Fin. Partners, LLC*, 2010 WL 1194950, at *12 (N.D. Ill. Mar. 22, 2010); *Collins v. Sparacio*, 2003 WL 21254256, at *3 (N.D. Ill. May 30, 2003); *Shalabi v. Huntington Nat'l Bank*, 2001 WL 777055, at *2-3 (N.D. Ill. July 11, 2001); *Zanayed v. Gertler & Gertler, Ltd.*, 2000 WL 294183, at *2 (N.D. Ill. Mar. 17, 2000).

The conclusion Calvary draws from these cases—that Plaintiffs' inability to sue the Law Firms under the ICFA means that they may not sue Calvary—is incorrect. As noted above, the amended complaint plausibly alleges Cavalry's "active and direct" participation in the underlying

conduct, thus providing a basis for Cavalry's direct liability under the ICFA. It follows that the Law Firms' immunity from suit under the ICFA does not extend, at least at this stage of the proceedings, to Calvary.

## IV.    FDCPA Claims Against Calvary and the Law Firms

"The primary goal of the FDCPA is to protect consumers from abusive, deceptive, and unfair debt collection practices." *Jenkins v. Heintz*, 124 F.3d 824, 828 (7th Cir. 1997) (internal quotation marks omitted). Section 1692e prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e; *see Ruth v. Triumph P'ships*, 577 F.3d 790, 799-800 (7th Cir. 2009) (quoting *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645-46 (7th Cir. 2009)). The provision essentially is a "rule against trickery." *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 473 (7th Cir. 2007). The provision's text sets forth a nonexhaustive list of prohibited practices, including "[t]he false representation of ... the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A), "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken," *id*. § 1692e(5), and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer, *id*. § 1692e(10). *See Ruth*, 577 F.3d at 794 n.2.

The filing of a legally defective debt collection suit can violate § 1692e where the filing falsely implies that the debt collector has legal recourse to collect the debt. In *Gearing v. Check Brokerage Corp.*, 233 F.3d 469 (7th Cir. 2000), a company called Check Brokerage purchased from Ayerco, a convenience store, a bad check that Gearing had written to Ayerco; Check Brokerage then brought a debt collection action against Gearing. *Id*. at 471. Illinois law

-21-

provided at the time that the subrogee (there, Check Brokerage) of a bad check's payee (there, Ayerco) could sue for the face value of the check, treble damages up to $1,500, and attorney fees and costs. *Ibid*. Unfortunately for Check Brokerage, its purchase agreement with Ayerco did not make it Ayerco's subrogee, meaning that it was prohibited from suing Gearing on the check. *Id*. at 472. The Seventh Circuit held that Check Brokerage had violated § 1692e because its state court complaint incorrectly alleged that it was Ayerco's subrogee, thus giving "a false impression as to the legal status it enjoyed." *Ibid*.; *see also Manlapaz v. Unifund CCR Partners*, 2009 WL 3015166, *2-3, 5 (N.D. Ill. Sept. 15, 2009) (holding that the plaintiff stated an FDCPA claim where the defendant allegedly filed a debt collection suit for an account it did not own); *Matmanivong v. Unifund CCR Partners*, 2009 WL 1181529, *5 (N.D. Ill. Apr. 28, 2009) (same); *Foster v. Velocity Investments, LLC*, 2007 WL 2461665, at *2 (N.D. Ill. Aug. 24, 2007) (same). *Gearing* applies with equal force here, where Calvary allegedly brought debt collection actions against Plaintiffs even though it lacked the documentation required by § 8b of the ICAA, thus giving the "false impression" that it had the "legal status" necessary under § 8b to file the suits. Grant-Hall also has an independent § 1692e claim based on Kelly's alleged threat to file a collection action without the required documentation. *See Day*, 511 F. Supp. 2d at 956-57 (citing § 1692e(5)). Because the amended complaint states a claim under § 1692e, there is no need at this point to consider whether Plaintiffs' allegations also support a claim under § 1692f.

The Law Firms separately argue that the FDCPA claim against them should be dismissed because the claim is premised on a violation of the ICAA, which does not govern the conduct of attorneys. The Law Firms are correct that they may not be sued under the ICAA. *See* 225 ILCS 425/2.03(5) (providing that the ICAA "does not apply to … [l]icensed attorneys at law").

-22-

However, the FDCPA does apply to the Law Firms. *See Heintz v. Jenkins*, 514 U.S. 291, 299 (1995) ("the [FDCPA] applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation"). And, as noted above, the FDCPA prohibits the filing of lawsuits in violation of § 8b's documentation requirements. It follows that while the ICAA's exemption for attorneys protects the Law Firms from ICAA liability, it does not preclude Plaintiffs from suing them under the FDCPA.

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss are denied. That is not to say that this litigation will proceed very far. Plaintiffs have acknowledged that their entire case rests on the premise that Defendants filed the state court collection actions even though Calvary did not have the documentation required by § 8b of the ICAA. Although the required documentation is not attached to Plaintiffs' amended complaint or to Defendants' motions to dismiss, Calvary maintains that it did in fact have those documents when the state court actions were filed. Because this case would end if Calvary is right, the court has invited Calvary to move without delay for summary judgment on that ground. If that motion is filed, the court will determine whether Calvary's documents satisfied § 8b and therefore whether this case can proceed.

February 24, 2012

_____
United States District Judge