UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CAROLE GRANT-HALL, PAUL J. ASIAMA, CORNELIUS GRAY, and JAMES M. KLIMA, on behalf of themselves and those similarly situated, | ) ) ) ) | 11 C 1832 |
| Plaintiffs, | ) ) ) | Judge Feinerman |
| vs. | ) ) | |
| CAVALRY PORTFOLIO SERVICES, LLC, ARTHUR B. ADLER & ASSOCIATES, LTD. d/b/a ADLER & ASSOCIATES, LTD., LAW OFFICE OF KEITH S. SHINDLER, LTD. d/b/a THE SHINDLER LAW FIRM, and KEVIN M. KELLY, P.C., | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Carole Grant-Hall, Paul J. Asiama, Cornelius Gray, and James M. Klima brought this putative class action against Cavalry Portfolio Services, LLC ("Cavalry"), a debt collection agency that brought collection suits against them in Illinois state court, and Arthur B. Adler & Associates, Ltd., Law Office of Keith S. Shindler, Ltd., and Kevin M. Kelly, P.C. (together, "Law Firms"), the law firms that represented Cavalry in those suits. (A fifth plaintiff, Jena Perry, voluntarily dismissed her claims. Docs. 134, 135.) The second amended complaint purports to state claims against Cavalry under the Illinois Collection Agency Act ("ICAA"), 225 ILCS 425/1 *et seq*., and the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/1 *et seq*., and against all Defendants under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. Doc. 108. As Plaintiffs have acknowledged, each claim rests on the premise that Defendants filed the state court actions even though Cavalry did not have the documentation required by § 8b

-1-

of the ICAA, 225 ILCS 425/8b, which provides that a debt collection agency may file suit in its own name against a debtor only if it has been assigned the debtor's account, and only if the assignment has been documented in a written agreement that states the effective date of and consideration paid for the assignment and that identifies the assigned account.

Defendants moved to dismiss the amended complaint under Federal Rule of Procedure 12(b)(6). Docs. 51, 55. Although the court denied the motions, 856 F. Supp. 2d 929 (N.D. Ill. 2012), it concluded its opinion by observing:

> [T]his litigation [may not] proceed very far. Plaintiffs have acknowledged that their entire case rests on the premise that Defendants filed the state court collection actions even though Cavalry did not have the documentation required by § 8b of the ICAA. Although the required documentation is not attached to Plaintiffs' amended complaint or to Defendants' motions to dismiss, Cavalry maintains that it did in fact have those documents when the state court actions were filed. Because this case would end if Cavalry is right, the court has invited Cavalry to move without delay for summary judgment on that ground. If that motion is filed, the court will determine whether Cavalry's documents satisfied § 8b and therefore whether this case can proceed.

*Id*. at 945. Cavalry took up the court's invitation and moved for summary judgment. Doc. 150. The motion is granted.

**Background**

The facts are stated as favorably to Plaintiffs as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). Cavalry is a collection agency licensed under the ICAA to operate in Illinois. Doc. 159 at ¶¶ 2-3. Cavalry SPV I ("SPV I") is in the business of acquiring debts allegedly in default. *Id*. at ¶ 9. SPV I acquires debts from many major banks, consumer finance companies, utilities, and other financial institutions. *Id*. at ¶ 10. Debts acquired by SPV I are collected and serviced by Cavalry, which is affiliated with SPV I,

pursuant to a Servicing and Management Agreement dated June 13, 2003 ("SMA"). *Id*. at ¶ 11; Doc. 152-1 at 1-9. The services provided by Cavalry under the SMA include: "(a) receiving, processing, and accounting for all Collections in respect of the Account Portfolio, (b) monitoring and pursuing payment of obligations included in the Account Portfolio, (c), subject to Section 7, judicial enforcement of obligations included in the Account Portfolio, including engagement of attorneys for such purpose, and (d) taking all lawful actions and procedures as reasonably required to maximize the value of the Account Portfolio and collect on the obligations included therein." Doc. 152-1 at 2; Doc. 159 at ¶ 12. Cavalry does not purchase or own debts; SPV I is the entity that purchases and takes title to debts. Doc. 163 at ¶ 39. SPV I pays Cavalry a Service Fee for its services. Doc. 159 at ¶¶ 13-14.

On March 18, 2003, Grant-Hall opened an account ending in #0613 ("Grant-Hall Account") with HSBC Bank Nevada, N.A./Orchard Bank. *Id*. at ¶ 15. On January 26, 2010, pursuant to a written Purchase Agreement with HSBC dated July 10, 2009, SPV I purchased the Grant-Hall Account along with a portfolio of other debts. Doc. 152 at ¶¶ 12-14; Docs. 152-3, 152-6. This transaction was documented by a Bill of Sale dated January 29, 2010; by that instrument, HSBC sold, assigned, and conveyed to SPV I all of HSBC's right, title, and interest in and to "those certain purchased receivables listed on the Sale File attached as Exhibit A." Doc. 152 at ¶ 14; Doc. 152-7. The Sale File lists the account number, the account holder's name, address, and phone number, and the account balance for each account in the portfolio, including the Grant-Hall Account. Doc. 152 at ¶ 15; Doc. 152-7 at 2-4. Pursuant to a written Assignment effective as of January 27, 2010, SPV I assigned to Cavalry its "rights to pursue collection and judicial enforcement of each of the Assignor's accounts purchased pursuant to that Purchase

Agreement dated July 10, 2009"; as just noted, among those accounts was the Grant-Hall Account. Doc. 152 at ¶ 16; Docs. 152-7, 152-8. This assignment was made "for the consideration of Assignor's covenants in the Servicing and Management Agreement between Assignor and Assignee dated as of June 13, 2003." Doc. 152 at ¶ 17; Doc. 152-8.[*]

On January 29, 2007, Asiama opened an account ending in #8735 ("Asiama Account") with Wells Fargo Bank, N.A. Doc. 159 at ¶ 21. On February 19, 2010, pursuant to a written Purchase Agreement with Wells Fargo dated January 14, 2010, SPV I purchased the Asiama Account along with a portfolio of other debts. Doc. 152 at ¶¶ 18-19; Docs. 152-9, 152-10. This transaction was documented by a Bill of Sale dated February 19, 2010; by that instrument, Wells Fargo sold, transferred, assigned, set over, and conveyed to SPV I its right, title, and interest in and to "each of the Receivables identified in Schedule I hereto." Doc. 152 at ¶ 19; Doc. 152-10. Schedule I lists the account number, the account holder's name, address, and phone number, and the account balance for each account in the portfolio, including the Asiama Account. Doc. 152 at ¶ 20; Doc. 152-10 at 2-3. Pursuant to a written Assignment effective as of February 22, 2010, SPV I assigned to Cavalry its "rights to pursue collection and judicial enforcement of each of the Assignor's accounts purchased pursuant to that Purchase Agreement dated January 14, 2010, by and between Cavalry SPV I, LLC and Wells Fargo"; as just noted, among those accounts was the

---

[*] Plaintiffs deny the facts in all but the first sentence of this paragraph. Doc. 159 at ¶¶ 16-20. They contend that "[n]o Exhibit A identified as such has been produced in this case" and that "[t]here is nothing to establish that the two pages that purportedly contain Grant-Hall's account information were part of any sale file" or "any purported assignment." *Ibid*. However, those facts are established by a declaration executed by Alfred J. Brothers, the CEO of SPV I. Doc. 152 at ¶¶ 14-15. The same holds for Plaintiffs' denials of the facts concerning the purchase and assignment of Ariama's, Gray's, and Klima's debts. Doc. 159 at ¶¶ 22-26, 28-32, 34-38. This issue is addressed in greater detail in Section II of the Discussion section.

Asiama Account. Doc. 152 at ¶ 21; Docs. 152-10, 152-11. This assignment was made "for the consideration of Assignor's covenants in the Servicing and Management Agreement between Assignor and Assignee dated as of June 13, 2003." Doc. 152 at ¶ 22; Doc. 152-11.

On September 3, 1999, Gray opened an account ending in #8825 ("Gray Account") with Bank of America/FIA Card Services, N.A. Doc. 159 at ¶ 27. On December 18, 2009, pursuant to a written Loan Sale Agreement with Bank of America/FIA dated December 16, 2009, SPV I purchased the Gray Account along with a portfolio of other debts. Doc. 152 at ¶¶ 23-24; Docs. 152-12, 152-13. This transaction was documented by a Bill of Sale dated December 18, 2009; by that instrument, Bank of America/FIA sold, transferred, assigned, set over, quitclaimed, and conveyed to SPV I its right, title, and interest in and to "each of the loans identified in the loan schedule attached hereto." Doc. 152 at ¶ 24; Doc. 152-13. The loan schedule lists the account number, the account holder's name, address, and phone number, and the account balance for each account in the portfolio, including the Gray Account. Doc. 152 at ¶ 25; Doc. 152-13 at 2-4. Pursuant to a written Assignment effective as of December 30, 2009, SPV I assigned to Cavalry its "rights to pursue collection and judicial enforcement of each of the Assignor's accounts purchased pursuant to that Purchase Agreement dated December 16, 2009, by and between Cavalry SPV I, LLC and FIA"; as just noted, among those accounts was the Gray Account. Doc. 152 at ¶ 26; Docs. 152-13, 152-14. This assignment was made "for the consideration of Assignor's covenants in the Servicing and Management Agreement between Assignor and Assignee dated as of June 13, 2003." Doc. 152 at ¶ 27; Doc. 152-14.

On December 15, 2005, Klima opened an account ending in #0832 ("Klima Account") with HSBC. Doc. 159 at ¶ 33. On September 27, 2010, pursuant to a written Purchase

Agreement with HSBC dated July 9, 2010, SPV I purchased the Klima Account along with a portfolio of other debts. Doc. 152 at ¶¶ 28-29; Docs. 152-15, 152-16. This transaction was documented by a Bill of Sale dated September 29, 2010; by that instrument, HSBC sold, assigned, and conveyed to SPV I its right, title, and interest in and to "those certain purchased receivables listed on the Sale File attached as Exhibit A." Doc. 152 at ¶ 29; Doc. 152-17. The Sale File lists the account number, the account holder's name, address, and phone number, and the account balance for each account in the portfolio, including the Klima Account. Doc. 152 at ¶ 30; Doc. 152-17 at 2-5. Pursuant to a written Assignment effective as of September 29, 2010, SPV I assigned to Cavalry its "rights to pursue collection and judicial enforcement of each of the Assignor's accounts purchased pursuant to that Purchase Agreement dated July 9, 2010"; as just noted, among those accounts was the Klima Account. Doc. 152 at ¶ 31; Docs. 152-17, 152-18. This assignment was made "for the consideration of Assignor's covenants in the Servicing and Management Agreement between Assignor and Assignee dated as of June 13, 2003." Doc. 152 at ¶ 32; Doc. 152-18.

## Discussion

By "demanding strict proof of an account's chain of title before an action may commence to collect on that account," § 8b of the ICAA addresses the "real danger" that "debtors might be sued by a party who does not have a legal interest in their debt." *Unifund CCR Partners v. Shah*, 946 N.E.2d 885, 893 (Ill. App. 2011). Section 8b states that "[n]o litigation shall commence in the name of the licensee as plaintiff unless … there is an assignment of the account that satisfies the requirements of this Section." 225 ILCS 425/8b(e). The provision further states that "[t]he assignment [must be] manifested by a written agreement … [which] shall specifically state and

include: (i) the effective date of the assignment; and (ii) the consideration for the assignment."
225 ILCS 425/8b(a); *see Mutual Mgmt. Servs., Inc. v. Swalve*, 956 N.E.2d 594, 598-99 (Ill. App. 2011); *Shah*, 946 N.E.2d at 892; *Bus. Serv. Bureau, Inc. v. Webster*, 698 N.E.2d 702, 704 (Ill. App. 1998); *Day v. Check Brokerage Corp.*, 511 F. Supp. 2d 950, 956-57 (N.D. Ill. 2007). "Implicit in the statute is a third requirement that the contract of assignment specifically state the relevant identifying information for the account that is being assigned." *Shah*, 946 N.E.2d at 892.

As noted above, if Cavalry had the documentation required by § 8b, then it is entitled to summary judgment on all of Plaintiffs' claims. Plaintiffs argue that Cavalry's documentation falls short in two respects: (1) it does not show that SPV I transferred legal title in Plaintiffs' accounts to Cavalry; and (2) it does not show that SPV I ever acquired Plaintiffs' accounts from the banks in the first place. Each ground is considered in turn.

**I.       The Assignment of Legal Title from SPV I to Cavalry**

Section 8b states in relevant part that "[a]n account may be assigned to a collection agency for collection with title passing to the collection agency to enable collection of the account in the agency's name as assignee for the creditor provided: (a) The assignment is manifested by a written agreement, separate from and in addition to any document intended for the purpose of listing a debt with a collection agency." 225 ILCS 425/8b. Plaintiffs argue that the assignments adduced by Cavalry "do not give [it] 'legal title' to the accounts sued upon" because the assignments "do[] not convey or even mention title"; they further contend that Cavalry "is merely the servicer of those debts." Doc. 160 at 6.

Contrary to Plaintiffs' submission, the assignments indisputably gave Cavalry the right to sue on the debts held by SPV I. Each assignment states that SPV I assigns to Cavalry "all of Assignor's rights to pursue collection and judicial enforcement of obligations under each of the Assignor's accounts … including engagement of attorneys and commencement of legal actions reasonably required to enforce said obligations." Docs. 152-8, 152-11, 152-14, 152-18. Each assignment references the SMA between SPV I and Cavalry, in which Cavalry, in consideration for a Service Fee, agreed to seek "judicial enforcement of obligations included in the Account Portfolio, including engagement of attorneys for such purpose, and taking all lawful actions and procedures as reasonably required to maximize the value of the Account Portfolio and collect on the obligations included therein." Doc. 152-1 at 2.

An assignment for the purpose of pursuing collection and judicial enforcement is sufficient for purposes of § 8(b). As the court noted in its prior opinion:

> Cavalry … reads the amended complaint as alleging that § 8b was violated because Cavalry purchased Plaintiffs' accounts for collection purposes only, with the assignor retaining the right to the lawsuit's proceeds. The amended complaint does not appear to pursue that theory. The theory is not viable in any event. *See Shah*, 946 N.E.2d at 889-890 (holding that § 8b does not prohibit an assignee for collection purposes only from bringing a debt collection suit in its own name); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.,* 554 U.S. 269, 279-85 (2008) (noting the majority rule that "an assignee of a legal claim for money [may] sue when that assignee had promised to give all litigation proceeds back to the assignor").

856 F. Supp. 2d at 937 n.* (internal citations omitted). The Appellate Court of Illinois put the same point this way: "The general rule as to assignments for collection seems to be that the assignment does not transfer the beneficial ownership to the assignee, but vests legal title in the assignee, empowers the assignee to collect and permits the debtor to discharge himself by

making payment to the assignee." *Ecker v. Big Wheels, Inc.*, 483 N.E.2d 639, 641-42 (Ill. App. 1985) (internal quotation marks omitted).

While conceding that "no particular form of assignment is required," Doc. 160 at 7, Plaintiffs argue that an assignment is sufficient under § 8b only if it uses magic words like "title" or "ownership." Doc. 160 at 6. Plaintiffs offer no supporting authority for their view. The law holds that "a valid assignment must evidence the purpose to transfer ownership of the subject matter of the assignment and it must describe the subject matter of the assignment with sufficient particularity to render it capable of identification." *Clarin Corp. v. Mass. Gen. Life Ins. Co.*, 44 F.3d 471, 476 (7th Cir. 1994); *see also Stoller v. Exch. Nat'l Bank of Chi.*, 557 N.E.2d 438, 443 (Ill. App. 1990) (same); *Dimensions Med. Ctr., Ltd. v. Aetna Life Ins. Co.*, 1997 WL 208387, at *3 (N.D. Ill. Apr. 23, 1997) (same). Here, the assignments plainly evidence an intent to transfer ownership to Cavalry of a readily identifiable subject matter—SPV I's rights to pursue collection and judicial enforcement of certain debts.

Plaintiffs argue in the alternative that *Cavalry Portfolio Services v. Rocha*, 979 N.E.2d 930 (Ill. App. 2012), collaterally estops Cavalry from asserting that it holds a legally valid assignment from SPV I. The argument is wholly without merit. *Rocha* was an appeal from the trial court's denial of a debtor defendant's petition to vacate a default judgment entered for Cavalry after the debtor failed to answer Cavalry's debt collection complaint. The state appellate court reversed, holding that the limited record before it—which consisted of Cavalry's complaint and its attachments, which were "account statements from Washington Mutual Bank stating that ownership of Rocha's account had been transferred to Chase Bank," "account statements from Chase Bank," and "letters that assigned the rights, title, and interest of unspecified accounts from

Chase Bank to Riverwalk Holdings, Ltd., from Riverwalk Holdings, Ltd. to Cavalry SPV I, LLC and from Cavalry SPV I, LLC to Cavalry Portfolio"—did not include all of the documentation required by § 8b. *Id*. at 932, 934.

It is hardly surprising that Cavalry did not attach all documents required by § 8b to the complaint it filed in *Rocha*. Defendants here did not attach all those documents to the state court complaints they filed against Plaintiffs; as the court's earlier opinion noted, that did not violate § 8b:

> Defendants read the amended complaint as alleging that they violated § 8b by failing to attach all the required documentation to the state court complaints. Plaintiffs disclaim that theory and wisely so; § 8b does not govern the documents that must be attached to an initial pleading, but merely requires that certain documentation *exist* before a debt collection agency files a collection action.

856 F. Supp. 2d at 937 n.* (internal citations omitted). Consistent with this understanding, *Rocha* did not hold that Cavalry had violated § 8b; it merely held, on the limited record before it, that Cavalry had not established that it had complied with § 8b. *Rocha* therefore does not collaterally estop Cavalry from arguing in this case, on a more complete record and in a suit involving different debtors and different debts, that it complied with § 8b with respect to Plaintiffs here. *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 628 (7th Cir. 2010) ("Preclusion applies if (1) the issue sought to be precluded is the same as that involved in the prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action."); *Chi. Truck Drivers, Helpers & Warehouse Union (Indep.) Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526, 530-31 (7th Cir. 1997) (holding that "offensive use of

collateral estoppel may be unfair to a defendant" when "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result") (internal quotation marks and alteration omitted).

II.     The Sale of Plaintiffs' Accounts to SPV I

Plaintiffs next contend that the documents adduced by Cavalry are insufficient under § 8b to show that SPV I actually acquired Plaintiffs' accounts from the banks; if Plaintiffs are right, then Cavalry would not have the documents necessary to show a valid assignment of the accounts to it from SPV I. But Plaintiffs are not right: the assignments from SPV I and Cavalry incorporate by reference the purchase and sale agreements between the originating lenders and SPV I; the purchase and sale agreements incorporate by reference additional documents, including bills of sale and sale files; and the bills of sale and sale files identify the specific accounts, including Plaintiffs' accounts, that were sold to SPV I and then assigned to Cavalry. Docs. 152-3, 152-7, 152-8, 152-9, 152-10, 152-11, 152-12, 152-13, 152-14, 152-15, 152-17, 152-18. All of those documents were authenticated by a declaration executed by Alfred J. Brothers ("Brothers Declaration"), the CEO of SPV I. Doc. 152.

Illinois law holds that "an assignment under section 8b can be established through multiple documents that are incorporated by reference into the contract of assignment." *Shah*, 946 N.E.2d at 891-92; *see generally Provident Fed. Savings & Loans Ass'n v. Realty Centre, Ltd.*, 454 N.E.2d 249, 251 (Ill. 1983) ("an instrument may incorporate all or part of another instrument by reference"). That is what Cavalry has done here; the documents concerning the Grant-Hall Account are illustrative. The July 10, 2009 Purchase Agreement between HSBC and SPV I references a "Bill of Sale," which the Purchase Agreement defines as "[t]he documents

evidencing the sale of the Purchased Account and Purchased Receivables, by Seller to purchaser in the form of the document attached hereto as Exhibit A." Doc. 152-3 at 2. The Bill of Sale states that HSBC "does hereby sell, assign and convey to Purchaser [SPV I], its successor and assigns, all rights, title and interest of Seller in and to those certain purchased receivables listed on the Sale File attached as Exhibit A." Doc. 152-7. Attached to the Bill of Sale are three pages containing information on Grant-Hall's account with HSBC, including her name, address, and account number, and other account details, *id*. at 2-4; the Brothers Declaration attests that those pages are part of the Sale File, Doc. 152 at ¶ 15. (Information regarding the other accounts in the Sale File is redacted.) The Assignment between SPV I and Cavalry assigns to Cavalry the right to pursue collection and judicial enforcement under any of the accounts included in the July 10, 2009 Purchase Agreement. Doc. 152-8. Taken together, these documents satisfy § 8b with respect to Grant-Hall. As shown in the Background section, the record contains materially identical documents for Asiama's, Gray's, and Klima's accounts.

Plaintiffs respond that the Brothers Declaration does not establish that SPV I acquired an ownership interest in Plaintiffs' accounts. In support, Plaintiffs cite *Shah* for the proposition that § 8b does not permit affidavits to be used as "substitutes for formally executed contracts of assignment." 946 N.E.2d at 893. But that is not what Cavalry has done here. Cavalry offers the Brothers Declaration not as a *substitute* for formally executed contracts of assignment, but rather to *authenticate* the documents that evidence a proper assignment. Such authentication is permitted and in fact necessary on summary judgment. *See Bloodsworth v. Vill. of Greendale*, 475 F. App'x 92, 94 (7th Cir. 2012) ("[i]n general, business records offered at summary

judgment must be authenticated with an affidavit from a qualified person"); *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2006).

Plaintiffs also contend that the documents are inadmissible hearsay because "Brothers cannot authenticate or vouch for documents or information coming from HSBC, Bank of America/FIA, and Wells Fargo." Doc. 160 at 11. Federal Rule of Evidence 803(6) excepts business records from the hearsay ban if certain conditions for admissibility are met, so long as those conditions "are shown by the testimony of the custodian or another qualified witness." Fed. R. Evid. 803(6). The Rule "does not require the witness [himself] to have created the records about which [he] is testifying." *Krawczyk v. Centurion Capital Corp.*, 2009 WL 395458, at *5 (N.D. Ill. Feb. 18, 2009); *see also Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006) (same). Consistent with this principle, *Krawczyk* held that an affidavit from the debt collector's Vice-President could properly establish the authenticity of account files from the bank (from whom the debt collector had acquired the debt) because the debt collector "integrated the [bank's] records into its own records." *Krawczyk*, 2009 WL 395458, at *5-6; *see also Matter of Ollag Construction Equipment Corp.,* 665 F.2d 43, 46 (2d Cir. 1981) (finding that "business records are admissible if witnesses testify that the records are integrated into a company's records and relied upon in its day-to-day operations"). To "hold otherwise would severely impair the ability of assignees of debt to collect the debt due because the assignee's business records of the debt are necessarily premised on the payment records of its predecessors." *Beal Bank, SSB v. Eurich*, 831 N.E.2d 909, 914 (Mass. 2005).

Plaintiffs next argue that there is no proof that the pages that Cavalry *says* were attached to the Bills of Sale—the pages referencing information regarding Plaintiffs' accounts—were

*actually* attached to the Bills of Sale. Specifically, Plaintiffs argue: "Nowhere on the actual pages identifying Plaintiffs is there anything stating that these documents are exhibits to any bills of sale or anything linking them to any other document in any way. As such, it is impossible to determine whether Plaintiffs' accounts were included in those purportedly assigned to Cavalry." Doc. 160 at 16. Cavalry responds that the pages referencing Plaintiffs' account information came from electronic files conveyed to SPV I when it acquired the portfolios, which explains why those pages are not explicitly identified as being part of a sales file. Doc. 164 at 7-8.

This explanation is sensible but ultimately beside the point. The Brothers Declaration authenticates all the documents, including the Bills of Sale and their attachments; significantly, it avers that the attachments list Plaintiffs' accounts and actually are attached to the Bills of Sale. Doc. 152 at ¶¶ 14-15, 19-20, 24-25, 29-30. After Defendants moved for summary judgment, Plaintiffs moved under Rule 56(d) to postpone filing their response until after they had the opportunity to depose Brothers. Doc. 123. The court granted Plaintiffs' motion, Doc. 132, and Plaintiffs' Local Rule 56.1(b)(3)(C) statement of additional facts indicates that they deposed Brothers on September 24, 2012. Doc. 159 at 23-26. Despite deposing Brothers, Plaintiffs offer no evidence even remotely suggesting that Brothers' authentication of the documents is a lie or wrong or that the documents are somehow inauthentic or inaccurate. Plaintiffs therefore have not adduced a genuine dispute on this point sufficient to forestall summary judgment. *See Leidborth v. Belvidere Nat'l Bank*, 337 F.3d 931, 934 n.1 (7th Cir. 2003) ("Generalized denials do not suffice under [Rule 56.1]."); *Sandefur v. Vill. of Hanover Park*, 862 F. Supp. 2d 840, n.1 (N.D. Ill. 2012) ("a general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial") (internal quotation marks omitted);

*Teninty v. Geren*, 776 F. Supp. 2d 725, 729 (N.D. Ill. 2011) ("denials, with no evidentiary support, are not sufficient to defeat summary judgment); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (same).

## Conclusion

As noted above, Plaintiffs' claims all rest on the premise that Defendants violated § 8b of the ICAA. For the foregoing reasons, Cavalry has demonstrated that it complied with § 8b. Accordingly, Cavalry is entitled to summary judgment. This disposition applies with equal force to Plaintiffs' claims against the Law Firms, so they are entitled to judgment as well.

March 6, 2013

                                  United States District Judge